**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOSEPH ATWELL, | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | Docket No. 2:26-cv-5947 |
| ANTHONY LETIZIO, DO, | ) | |
| *Defendants*. | ) | **JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff Joseph Atwell, by his attorneys at the Mizner Law Firm, files this Complaint and states as follows:

**A. Parties.**

1. Plaintiff Joseph Atwell is an adult individual who is currently incarcerated at the State Correctional Institution at Phoenix ("SCI Phoenix"), located at 1200 Mokychic Drive, Collegeville, Pennsylvania 19426.

2. Defendant Anthony Letizio, DO, is an adult individual who at all relevant times was the site medical director at SCI Phoenix, located at 1200 Mokychic Drive, Collegeville, Pennsylvania 19426. At all relevant times, Dr. Letizio was acting under color of state law, and a professional negligence claim is being asserted against him.

**B. Jurisdiction and Venue**

3. This Complaint includes claims made pursuant to the Civil Rights Act of 1964, 42 U.S.C. § 1983.

4. This Honorable Court has jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 & 1343.

5. This Complaint also includes pendent state law claims, over which this Honorable Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

6. Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred within the territorial jurisdiction of this District and the Defendants are subject to personal jurisdiction within this District.

## C. <u>Facts</u>

7. Mr. Atwell was diagnosed with Ulcerative Colitis in 2012, when he was about thirty-eight years old.

8. Ulcerative colitis (UC) is a chronic bowel disease that causes long-lasting inflammation and ulcers in the innermost lining of a person's lower intestinal tract, specifically the colon and rectum. Its symptoms often include abdominal cramping, bloody diarrhea, and an urgent need to relieve oneself.

9. In addition, the chronic inflammation associated with undertreated UC can be associated with several life threatening complications including, but not limited to, perforation, bleeding, infections, and colorectal cancer.

10. The precise cause of UC is not known, but it involves an overreaction of the immune system, which mistakenly attacks the lining of a person's colon.

11. Unfortunately, there is no cure for UC, but medical therapies can effectively manage the condition and allow for long periods of remission.

12. The standard of care for managing UC typically falls under two paradigms: "Step Up" and "Top Down" approaches.

13. In the "Step Up" approach, patients are typically started on less potent agents such as Sulfasalazine or topical corticosteroids, and then uptitrating to newer Biologic or small molecule medications if the patient fails to respond. All of these medications target the inflammation caused by UC, but they all work in different manners.

14. The rationale for this approach is that many patients oftentimes do respond to less potent medications, thereby sparing them from potentially severe side effects, while achieving disease control.

15. Conversely, the "Top Down" approach starts with more potent medications such as Biologics or small molecule medications to maximize the chances of reducing inflammation, and improving the likelihood of achieving a remission and avoiding complications requiring surgical intervention.

16. Based on the existing medical literature, either approach is acceptable towards achieving the goal of disease remission.

17. With either approach, an initial regimen is trialed, and progress towards disease remission is measured through a combination of improvement in subjective symptoms, laboratory evaluation with downtrending inflammatory markers such as CRP or Fecal Calprotectin, and improvements in the visual appearance of the bowel on colonoscopy.

18. If there is a failure to improve through these metrics, oral or intravenous corticosteroids, such as Prednisone, can be used as a temporary bridging measure to alternative definitive escalations in therapy.

19. Corticosteroids can be highly effective in reducing inflammation, but at a significant cost to patients due to its countless deleterious effects including the inability to fight

infections, suppression of innate hormone secretion, loss in bone mass, malnutrition, and countless others.

20. As such, Corticosteroids should be limited in their use, and only as a bridge to alternative treatment strategies, such as more potent medications like Biologics, small molecule drugs, or surgery. Corticosteroids as a stopgap measure for acute inflammatory bowel disease flares are typically prescribed at high doses, and then slowly weaned over the course of several weeks only when there is a clear improvement in symptoms as well as clear plan for an alternative treatment option.

21. There is medical evidence that delays in the initiation of Biologic or small molecule therapy for active inflammatory bowel disease flares can be associated with worse outcomes.

22. These studies most commonly identify an associated increased risk of requiring emergent surgery from delays in initiating Biologic therapy on the order of days to weeks.

23. Medical literature also indicates that these increased risks of emergent surgery thereby contribute to an increased risk of death due to a delayed initiation of Biologic or small molecule therapy.

24. Leaving ulcerative colitis or any inflammatory bowel disease untreated can lead to serious, even life-threatening complications, including permanent injury to the colon such as toxic megacolin or a ruptured or perforated bowel. As UC progresses untreated, its symptoms can become more difficult to manage.

25. It is also widely accepted that undertreated inflammation from inflammatory bowel disease, including UC, can contribute to the progression of colorectal cancer.

26. The chronic cycles of damage from the inflammation to the lining of the intestine leads to precancerous changes known as dysplasia, which can then continue on to evolve into invasive colorectal cancer.

27. Currently, and over the past several years, there is a significant cost difference between prescription biologics, such as xeljanz, and steroids which may be prescribed to address symptoms of UC.

28. While biologics may cost $9,000.00 or more per course, while the typical steroid to treat UC may be as cheap as $20.00 per course.

29. Dr. Letizio and other providers at SCI Phoenix, were subject to both informal and formalized processes, policies and procedures to control costs for their employer, Wellpath.

30. The providers helped keep Wellpath's medical expenses as low as possible by, among other things, controlling prescribed care by ensuring that only certain types of medication could be prescribed without outside approval, and certain medical treatments and outside consultations could only be ordered if they were approved through the "collegial review" process.

31. Upon information and belief, the site medical direct and the collegial review process is specifically intended to make medical care at SCI Phoenix as cost-efficient as possible.

32. Upon information and belief, Wellpath has a policy of limiting the number of biologics actually ordered and provided for inmates with UC, and instead treating UC with cheaper medications, even when biologics were recommended by an inmate's treating specialists.

33. Upon information and belief, Wellpath's policy in this regard was implemented and enforced by Dr. Letizio, the site medical director, and the collegial review process.

**<u>Mr. Atewll's Medical Care at SCI Phoenix.</u>**

34. After significant periods of remission after being diagnosed with UC in 2012, Mr. Atewll experienced symptoms of uncontrolled UC in 2023, which he reported to the prison medical providers.

35. On November 24, 2023, Susan Miller, CRNP noted Mr. Atwell's UC was exacerbated with bloody stools, and planned for a prednisone taper, a steroid.

36. On December 4, 2023, Ashley Senkowski, CRNP noted Mr. Atwell was having multiple bowel movements every day, and that he had been ordered a steroid taper recently, but had not been provided the full dose. She decided to re-order a short steroid taper, along with two packages of tucks pads per month. Tucks pads were prescribed to help relieve the rectal burning, itching and irritation caused by Mr. Atwell's frequent bowel movements from his UC.

37. On December 15, 2023, Mr. Atwell advised Ashley Senkowski, CRNP that the last steroid taper he received was not helpful. Her treatment plan was "Prednisone taper."

38. On January 25, 2024, Elliott Yodh, PA noted the medication was not helping, and Mr. Atwell was defecating fifteen times a day, consisting of "spaghetti blood strings." PA Yodh's treatment plan was to educate Mr. Atwell "to continue to taper the steroids as per medical plan before re-evaluation" and he denied Mr. Atwell's request for an extra box of Tucks.

39. On February 21, 2024, CRNP Miller noted "9-10 months of blood, mucous stool happening approx 20 times daily. Has had several courses of prednisone which he reports has not been effective. Also asked about a single cell." Her treatment plan was Prednisone 50 mg daily for three weeks, then 40mg for three weeks, with a consultation to a gastrointestinal specialist after a complete blood count and the prednisone course was completed. However, Mr. Atwell's request for a single cell was denied by Dr. Letizio, the site's medical director.

40. Mr. Atwell was not seen by the gastroenterologist until July 3, 2024, when he saw Matthew Dogan, PA, via telemedicine. PA Dogan planned for a repeat colonoscopy, to start budesonide 9mg daily, obtain labs, stool studies and testing “to potentially get step up therapy approved.” PA Dougan also noted that Mr. Atwell was anemic.

41. On July 11, 2024, Dr. Letizio referred Mr. Atwell to Einstein Hospital for a colonoscopy, and the procedure was scheduled for September 9, 2024.

42. On September 9, 2024, Mr. Atwell underwent a colonoscopy which confirmed moderate to severe symptoms of his ulcerative colitis, which had worsened compared to previous examinations. There was bleeding, swelling, erosions and ulcerations found throughout the entire sigmoid colon. He was advised to continue his same medications until the pathology reports were available and to repeat the colonoscopy in six months to assess disease activity. The physician who performed the colonoscopy noted, “agree with small molecule versus biologic.”

43. The pathology report from the biopsies performed during the colonoscopy showed, “active chronic colitis consistent with ulcerative colitis/proctitis.”

44. On October 4, 2024, Mr. Atwell was advised that per a “new DOC policy” he would no longer be receiving wet wipes, and would instead be provided five washcloths for cleaning his body.

45. On October 30, 2024, Dr. Letizio saw Mr. Atwell about his request for a z-code (single cell) and his request to be prescribed a biologic to address his UC. Dr. Letizio wrote, “at this time we will hold off on the z code and obtain the GI recommendations. His H/H are stable indicating that even if he is bleeding he is not to the degree he claims. He can follow us as needed. Once the recommendations are obtained we will review.”

46. On November 15, 2024, Ashley Senkowski, CRNP noted Mr. Atwell was suffering "severe symptoms of ulcerative colitis: severe bleeding, mucus, bathroom usage of 20+ times a day," and was reporting the "steroids are not effective." According to PA Senkowksi, "discussed this case with SMD [Letizio] prior to seeing the patient in sick call." PA Senkowski requested that the clinical coordinator to reach out to the gastroenterologist regarding possible initiation of xeljanz, "as they had recommended after colonoscopy pending results."

47. On December 31, 2024, Lilliam Goldman Muller, PA noted that Mr. Atwell was inquiring about any new medication he could take for his UC, and wrote that "Per GI, patient appears to be a candidate for Xelganz. Discussed with SMD and clinical coordinator and will work towards getting the medication."

48. On January 6, 2025, PA Muller wrote, "will follow up with SMD and clinical coordinator on the status of Xelganz."

49. On January 14, 2025, Pinky Bora Saikia, MD wrote that in September 2024, "G.I. recommended possible therapy with Biologics versus small molecule therapy."

50. Dr. Bora assessed Mr. Atwell with severe ulcerative colitis, but wrote in his treatment plan: "The patient has been educated that, NSAIDs are not indicated for worsening ulcerative colitis as that can potentially increase patient's risk of bleeding. Will follow up with SMD [Letizio] and clinical coordinator on the status of Xelganz."

51. On February 10, 2025, Beverley Zuccarello, PA wrote, "Patient presents with a chief complaint of wanting to follow up on his GI consultation status." Her treatment plan was "continue with GI consult once scheduled in order to obtain Xeljanz for his UC."

52. However, due to various scheduling issues with the prison, Mr. Atwell was not sent to a GI specialist until November 13, 2025 - a nine month delay.

53. Over the next nine months, Mr. Atwell was repeatedly reporting symptoms of his UC to the medical department, who repeatedly advised that he was awaiting a GI consultation. He complained over over 20 bloody stools per day. He began to suffer widespread joint pain, a symptom of inflammatory arthritis, related to UC.

54. Finally, on November 13, 2025, Mr. Atwell was seen by Steven Stanek, MD and Tara Chapman, PA from Einstein Healthcare Network, who noted

> For about 10 years, he had a few flares of his disease which required prednisone, but in general he found that his symptoms were fairly well-controlled on the sulfasalazine, Starting in 2023, his symptoms have gotten worse and really have not improved. His stools are soft and narrow. He moves his bowels up to 20 times daily with a significant amount of blood. He also has predominant left lower quadrant abdominal pain. I do have the most recent note from US digestive from July 2024. At that time, he was on sulfasalazine but having symptoms. He was started on budesonide at that time and then had a colonoscopy 9/9/2024. That report is in the chart. It showed protosigmoid ulcerative colitis and biopsies were consistent with that. The patient tells me that he was going to start Xeljanz but it never happened. He tells me he has lost 30 pounds since June.

55. The treatment plan was to have Mr. Atwell undergo a colonoscopy, and then "will most likely need to start a biologic medication." He was also assessed with iron deficiency anemia, which the providers associated with his known UC with bleeding.

56. On November 28, 2025, Bethia Crawley, PA wrote, "inmate here in regards to UC having a lot of rectal bleeding but this is his usual. Pending biologic drug to start." Her treatment plan was "Prednisone 50 mg for 5 days, pending new drug for UC."

57. On December 17, 2025, Cinthya Marquez-Lobos, CRNP wrote, "Patient arrives today [with] complaints of having an increased BP reading. Pt does have U.C. They have been currently seen by GI and they are going to be starting a biologic for it. Pt has been in a lot of pain because of it and having increased BP readings."

58. Finally, on December 29, 2025, Mr. Atwell underwent a colonoscopy and biopsy.

59. On January 7, 2026, Paula Patton, MD saw Mr. Atwell and noted he was still having 12-20 bloody stools a day. She discussed his case with the gastroenterologist office and ordered Rinvoque, for an eight week period with follow-up thereafter for next steps.

60. This course of medical treatment for Mr. Atwell violated the standard of care in at least four ways.

61. First, Mr. Atwell was forced to suffer with the significant effects of his UC from 2023 through 2026 because his providers at the prison repeatedly performed incomplete evaluations, and failed to timely escalate his care to specialists.

62. He had dozens of medical visits with reports of persistent and worsening symptoms over this period, including upwards of 15 to 20 bloody bowel movements per day. While the initial approach to assessing a potential exacerbation of UC should include a comprehensive history, physical exam and documentation of his vital signs, almost all of Mr. Atwell's visits to medical fail to include vital sign assessments or a documented physical examination.

63. Additionally, evaluation for disease control would also include a full set of laboratory testing, including a complete blood count to document his Hemoglobin levels, a Complete Metabolic Panel to demonstrate any potential electrolyte derangements from the frequent bowel movements, a C-Reactive Protein (CRP), Erythrocyte Sedimentation Rate (ESR), Fecal Calprotectin as well as infectious stool studies. However, the first time all of these studies were ordered in combination was July 2024 when Mr. Atwell was evaluated by the gastroenterologist. The studies were not reordered sequentially over time, making it impossible to document trends.

64. Additionally, a colonoscopy was not obtained until September 2024, over 21 months after the first documented note from January 2023, and almost two months after it was first recommended by the outside gastroenterologist. Then, despite a recommendation for follow-up colonoscopy in six months, the same did not occur until December 2025 - fifteen months later.

65. Second, there were multiple significant delays in the initiation of Mr. Atwell's treatment.

66. For example, there were several instances during which on-site providers had recommended a steroid taper, but the medications were not provided to Mr. Atwell until several weeks to months later. In most instances, it is not clearly documented when Mr. Atwell started and completed these steroid tapers.

67. Additionally, after the initial consultation with an outside gastroenterologist in July 2024, Mr. Atwell was recommended to transition to Budesonide as an alternative treatment option. From the medical progress notes, it is not clear that this was ever provided to him.

68. After the colonoscopy performed in September 2024, there is a documented recommendation to transition to a Biologic therapy, such a Xeljanz. There are numerous documented visits during which the patient inquired as to the status of this medication, but Xeljanz was never started. Instead, Mr. Atwell was continued on intermittent steroid tapers as driven by the prison medical provider team.

69. Although biologics were initially recommended in September 2024, they are not started until January 2026 - an inexcusably sixteen month delay, which can only be explained by the significant price difference between biologics and steroids. Despite the specialist's

recommendation, Mr. Atwell was repeatedly provided the ineffective, but cheaper, medication option.

70. Third, Mr. Atwell was provided with the wrong treatment.

71. The medical providers at the prison repeatedly prescribed Mr. Atwell numerous courses of high dose corticosteroids. In some notes, he is prescribed a steady elevated dose for several days to weeks without a clear plan for tapering. In other instances, he is prescribed a steroid taper immediately from the start, without first documenting a response in symptoms to the initial elevated dose.

72. In both cases, Mr. Atwell is subjected to additional harm without clear benefit. Elevated doses of corticosteroids can lead to a suppression of the body's own endogenous secretion of hormones. Sudden withdrawal of these high dose steroids without a slow taper plan can lead to sudden and dangerous decreases in several life-sustaining hormones.

73. When Mr. Atwell was prescribed a taper, the appropriate treatment would have Mr. Atwell first demonstrate improvement in symptoms prior to then lowering the dose. In many cases, this did not occur, without any explanation from the ordering medical providers, and without any medical justification whatsoever.

74. Corticosteroids are typically recommended as a bridging therapy to an alternative definitive therapy such as a biologic medication or surgery. Yet, most of Mr. Atwell's notes do not clearly indicate any definitive plans for the steroids to be a bridging therapy to an alternative strategies. In other words, Mr. Atwell's providers simply failed - *for years* - to form a treatment plan following his course of steroid treatment. This failure was particularly acute, given how frequently his providers documented that his steroids were not effective in addressing his UC symptoms.

75. Fourth, Mr. Atwell's treatment violated the standard of care because he was provided inconsistent longitudinal care.

76. UC is a chronic and complex autoimmune condition which is best served by consistent longitudinal care by either a single provider or a single practice. Mr. Atwell's care was fragmented not only within the prison healthcare system by the numerous providers that he saw, all of whom were guided by unclear and incomplete documentation.

77. AS a result of these four deviations from the standard of care, Mr. Atewll suffered a three year delay in appropriate escalation to biologic therapy, thereby subjecting him to persistent and immeasurable endoluminal damage to his gastrointestinal lining.

78. This chronic and untreated inflammation has led to an irreversible increased risk of colorectal cancer and potentially requiring surgery.

79. To date, Mr. Atwell has not undergone a colonoscopic evaluation that demonstrates a clear endoluminal response to therapy.

80. The three year delay in initiating biologic therapy, increased the risk that the damage he suffered during that period may ultimately be irreversible by medical therapy and would require surgery.

81. Surgery for UC is an incredibly morbid operation given that it involves the complete removal of the patient's entire colon and rectum.

82. Patients are then faced with the choice of either a permanent ileostomy or reconstruction with a j-pouch.

83. Reconstruction with a j-pouch results in a neo-rectum reservoir constructed from a piece of small intestine which is folded on itself to create a reservoir for stool, which is then connected to the anus.

84. This is associated with a permanent alteration in bowel function, along with potential urogenital dysfunction such as urinary retention and erectile dysfunction.

85. Additionally, Mr. Atwell was repeatedly exposed to high doses of corticosteroids. At times, he was prescribed these steroids in manners which may be considered inappropriate in certain settings, such as in settings without a clearly documented plan for a taper, or without a clear transition plan after completing the steroid regimen.

86. Steroids can be associated with numerous issues, such as a reduced ability to fight infections. During this time period, on March 6, 2024 her underwent a dental extraction which was complicated by a documented post-procedural surgical site infection.

87. Mr. Atwell's chronic exposure to steroids may have contributed to this.

88. Additionally Mr. Atwell was documented by a physical therapist on numerous occasions to have presented with numerous medium-sized joint pains.

89. The physical therapist is one of the first to suggest the possibility of this multi-joint issues to be a potential extra-intestinal manifestation of his UC. The delayed definitive management of Mr. Atwell's UC disease activity may have also led to persistent symptoms of his multi-joint arthropathy (joint pains).

90. In short, the care afforded to Mr. Atwell deviated from typical standards in care for the management of UC. Systematic patterns of delays in care as well as inconsistent longitudinal care by numerous providers led to duplicated care, subjected Mr. Atwell to additional procedural risks from repeated colonoscopies, and exposed him to immeasurable harm from both chronic high dose steroid exposure as well as a permanent and irreversible increased risk of colorectal cancer and potentially permanent life-altering surgery.

**Exhaustion of Administrative Remedies.**

91. On September 23, 2025, Mr. Atwell filed a grievance complaining about the ongoing failure of the medical staff to treat his UC, writing in part: "Griever has been desperately trying to receive treatment for his Chronic UC and tried to increase CCC visits for over two (2) years.Grievna has had new symptoms related to UC for approximately 1.5 years and has been anemic since at least February 2025 with no treatment until after 8/25/25."

92. On October 23, 2025, his grievance was denied, and was told that if he had any medical issues, to utilize the sick call process to be evaluated.

93. Mr. Atewll timely appealed, and his grievance eventually received a final denial from SOIGA on January 12, 2026, on the basis that "the medical care provided was reasonable and appropriate."

94. As such, Mr. Atwell has exhausted his administrative remedies, and his claims are ripe for adjudication by this Honorable Court.

## COUNT I - DELIBERATE INDIFFERENCE IN VIOLATION OF THE EIGHTH AMENDMENT

*Joseph Atwell*
*v.*
*Anthony Letizio, DO*

95. The averments in the preceding paragraphs are incorporated by reference, as if set forth in full herein.

96. Dr. Letizio knew of Mr. Atwell's serious medical needs.

97. Despite this knowledge, Dr. Letizio intentionally denied Mr. Atwell individualized care and has intentionally delayed treatment that was necessary to address his serious medical needs.

98. Dr. Letizio caused the wanton infliction of pain and thus exhibited deliberate indifference to the serious medical needs of Mr. Atwell, in violation of the Eighth Amendment.

99. Dr. Letizio prevented and delayed the prescription of necessary medical treatment, including biologics, because of their costs and instead persisted in a course of treatment which had already failed and been proven ineffective; namely, the prescription of cheaper steroids.

100. By denying Mr. Atwell individualized care and treatment of his UC consistent with the medical standard of care, Dr. Letizio has imposed punishment far in excess of that authorized by law, contrary to the Eighth Amendment.

101. Dr. Letizio's failure to timely provide Mr. Atwell medically-necessary UC prescriptions and medical treatment violates all standards of decency, contrary to the Eighth Amendment.

WHEREFORE, Plaintiff Joseph Atwell seeks judgment in his favor and against Dr. Anthony Letizio in an amount in excess of $75,000, along with all other relief permitted by law.

**COUNT II**
**PROFESSIONAL NEGLIGENCE**

*Joseph Atwell*
*v.*
*Anthony Letizio, DO*

102. The averments in the preceding paragraphs are incorporated by reference, as if set forth in full herein.

103. As Mr. Atwell's treating medical provider, Dr. Letizio, owed a duty of care to Mr. Atwell to ensure that he was referred for a surgical consultation, and provided corrective surgery if recommended by the examining surgeon.

104. Another aspect of this duty was to provide Mr. Atwell with the minimum standard of care required for someone in his condition and with his medical needs.

105. The standard of care for someone in Mr. Atwell's condition is to be referred to a GI specialist for review of his UC, and to follow the recommendation of the specialist which is often to start a course of biologics.

106. Dr. Letizio failed and refused to follow the recommendation of the specailist in a timely manner, opting to continue the same course of care which had already failed, because it was cheaper than prescribing the more expensive biologics recommended by the specialist.

107. The medical care, diagnosis, treatment and services rendered by Dr. Letizio, was performed in a negligent and careless manner and not in accordance with professional standards required of the conditions presented by Mr. Atwell.

108. Dr. Letizio failed to possess and/or exercise adequate medical skills, knowledge, experience and techniques for the proper treatment of Mr. Atwell.

109. As a direct and proximate result of the negligence by Dr. Letizio, Mr. Atwell has continued to suffer severe injury and pain, and lives with constant risk of greater injury.

110. As a direct and proximate result of the negligence by Dr. Letizio, Mr. Atwell has experienced pain and suffering and loss of life's pleasures.

111. As a direct and proximate result of the negligence by Dr. Letizio, Mr. Atwell has experienced pain and suffering, inconvenience, limitation on activities of daily living, mental anguish, and humiliation and embarrassment.

WHEREFORE, Plaintiff Joseph Atwell seeks judgment in his favor and against Dr. Anthony Letizio in an amount in excess of $75,000, along with all other relief permitted by law.

Respectfully submitted,

MIZNER LAW FIRM

By: /s/ Joseph P. Caulfield, Esq.

Joseph P. Caulfield
PA Bar No. 322823
jpc@miznerfirm.com

John F. Mizner
PA Bar No. 53323
jfm@miznerfirm.com

311 West Sixth Street
Erie, Pennsylvania 16507
(814) 454-3889

*Attorney for the Plaintiff*